# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| BRIAN GRAFF, | Case No.: 1:14-cv-00249-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| CORRECTIONS CORPORATION OF AMERICA, and DAVID AGLER, | **(Docket No. 11)** |
| Respondents. | |

Now pending before the Court is Defendants' Motion for Summary Judgment (Docket No. 11). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. BACKGROUND

This action relates to an injury Mr. Graff suffered while incarcerated at the Idaho Corrections Center ("ICC"), a private corrections facility previously owned and operated by Defendant Corrections Corporation of America ("CCA"). *See* Defs.' SOF No. 1 (Docket No.11, Att. 2); Pl.'s SODF No. 1 (Docket No. 14, Att. 1).[1] Mr. Graff generally claims that the treatment he received following his injury falls short of any conceivable standard of proper medical care, while demonstrating an institutional custom and practice of delaying medically-appropriate treatment. The relevant factual background is reflected chronologically as follows:

---

[1] As of July 1, 2014, ICC has been under the operation and control of the Idaho Department of Corrections ("IDOC") and is known as the Idaho State Corrections Center ("ISCC"). *See* Defs.' SOF No. 1 (Docket No. 11, Att. 2); Pl.'s SODF No. 1 (Docket Nos. 14, Att. 1).

**MEMORANDUM DECISION AND ORDER - 1**

**A.      October 2011 - November 2011**

1.      In October 2011, while working for maintenance at ICC, Mr. Graff injured his right wrist (Mr. Graff is right-handed) while installing a stainless steel toilet.  *See* Pl.'s SOF Nos. 2-3 (Docket No. 14, Att. 2).

2.      Mr. Graff went to ICC medical on October 24, 2011, after submitting a Health Services Request Form ("HSR Form") complaining of right wrist pain.  He was given a compression bandage and put on "medical idle" status excusing him from work.  *See* Defs.' SOF No. 4 (Docket No. 11, Att. 2); Pl.'s SODF No. 4 (Docket No. 14, Att. 1).[2]

3.      The pain did not subside and, on November 3, 2011, Mr. Graff saw a nurse practitioner.  *See id*.  The nurse practitioner ordered an x-ray, prescribed Mobic (brand name for meloxicam (a type of NSAID)), recommended further bandaging, and recommended that he return in a week for a right-wrist splint.  *See id*.

4.      A November 8, 2011 x-ray of Mr. Graff's wrist revealed no fracture or bony abnormality.  *See id*.

5.      On November 10, 2011, Mr. Graff saw the nurse practitioner again, who immobilized the wrist in a splint, instructed him to use ice and continue taking Mobic, and asked that he return in three weeks.  *See id*.

6.      The nurse practitioner saw Mr. Graff again on November 29, 2011, prescribing him Prednisone on a tapering plan and instructing him to return in a month.  *See id*.

---

[2]  According to Defendants (and not disputed by Mr. Graff), when inmates had routine health needs at ICC, they would submit a completed HSR Form, which was placed in a box designated for such in their housing units.  *See* Defs.' SOF, p. 3, n.1 (Docket No. 11, Att. 2). The HSR Forms were collected daily by staff, reviewed by a nurse, triaged, and then scheduled for follow-up within 24 hours.  *See id*.  Typically, the first visit was with a nurse and if the patient needed to see a nurse practitioner or doctor, they were then scheduled to do so.  *See id*. This process was separate and distinct from the grievance process at ICC; inmates seeking medical care were required to use the HSR Form process, not the grievance process.  *See id*.

**MEMORANDUM DECISION AND ORDER - 2**

**B.      December 2011**

7.      Two weeks later, on December 15, 2011, the nurse practitioner saw Mr. Graff, re-splinted his wrist, and ordered another x-ray.  *See id.* at Defs.' SOF No. 5; Pl.'s SODF No. 5.

8.      The December 22, 2011 x-ray again showed no fracture.  *See id.*

9.      On December 27, 2011, ICC's medial director and physician, Defendant David Agler, saw Mr. Graff and determined that he likely had De Quervain's tenosynovitis syndrome. *See id.*  Defendants claim that De Quervain's tenosynovitis syndrome is "essentially a type of inflammation near the base of the thumb, and for which conservative treatment is appropriate." *See id.*[3] Dr. Agler ordered a Kenalog injection (a type of corticosteroid) and physical therapy with follow-up.  *See id.*

**C.      January 2012 - February 2012**

10.      On January 2, 2012, Mr. Graff saw a physical therapist, at which time they discussed wrist exercises and the possible need to fix his splint.  *See id.* at Defs.' SOF No. 6; Pl.'s SODF No. 6.

11.      On January 9, 2012, Mr. Graff returned to physical therapy and his splint was rebuilt to provide more support.  *See id.*

12.      On January 10, 2012, Mr. Graff met with the nurse practitioner, who scheduled Mr. Graff to meet with Dr. Agler to discuss further treatment options.  *See id.*

_____

[3] Mr. Graff does not dispute this characterization of De Quervain's tenosynovitis syndrome generally, but questions whether conservative treatment was, in fact, appropriate as of December 27, 2011.  *See* Pl.'s SODF No. 5 (Docket No. 14, Att. 1) ("The Plaintiff does not dispute the Defendants' Fact #5 but takes exception to whether or not conservative treatment may have been appropriate on December 27[, 2011], more than 2 months after the injury. Defendants' statement infers that conservative treatment was still appropriate at that time, however, the Defendants stop short of actually identifying a date at which point conservative treatment was no longer appropriate.").

**MEMORANDUM DECISION AND ORDER - 3**

13.     Dr. Agler saw Mr. Graff on January 17, 2012 at which time Dr. Agler ordered an

MRI and determined that Mr. Graff may need to see an orthopedic specialist.  *See id*.

14.     On February 7, 2012, Mr. Graff filled out an Offender Concern Form, directed to

Dr. Agler, stating:

> It has been a few weeks since you told me I would get an MRI on my wrist and I still
> haven't received it.  I am starting to feel more pain in it and would like to find the
> problem out as soon as possible since it have been 4 ½ months since the injury
> occurred.

Ex. A, p. 1 to Graff Decl. (Docket No. 14, Att. 5).  The next day, Dr. Agler responded, indicating

that "[t]he MRI was ordered on 1/17/12" and "can take up to 2 months to get the MRI after it's

ordered . . . ." *Id*.

15.     Apparently, the MRI was scheduled to take place on February 15, 2012 but,

according to Defendants, "was cancelled by St. Luke's because their facility was backed up."

Defs.' SOF No. 6 (Docket No. 11, Att. 2); Pl.'s SODF No. 6 (Docket No. 14, Att. 1).[4]

**D.     March 2012**

16.     In his March 1, 2012 Offender Concern Form directed to ICC medical, Mr. Graff

indicated:

> I went for an MRI on my wrist on 2-22-12 and was told they would have to
> reschedule.  I would really like to know what is going on with my wrist and it hasn't
> gotten any better.

---

[4] Mr. Graff does not dispute the fact the treatment he received in January 2012 and
February 2012, but questions the reasons why the MRI did not take place on February 15, 2012.
*See* Pl.'s SODF No. 6 (Docket No. 14, Att. 1) ("The Plaintiff does not dispute Defendants' Fact
#6 except for the obvious hearsay statement concerning the reasons for the cancellation of the
Feb. 15 MRI.  The Defendants have not established that they have any actual knowledge of the
reasons for the cancellation, making their statement unsupportable."). Additionally, Mr. Graff
claims that he also was taken to an "MRI appointment" on February 22, 2012, but was turned
away at the hospital.  *See* Pl.'s SOF No. 6 (Docket No. 14, Att. 2).  It is unclear from the record
if Mr. Graff's MRI had to be rescheduled once or twice.

**MEMORANDUM DECISION AND ORDER - 4**

Ex. B, p. 2 to Graff Decl. (Docket No. 14, Att. 5); *see also* Pl.'s SOF No. 6 (Docket No. 14, Att. 2).  On March 5, 2012, an ICC staff member responded, stating: "Mr. Graff, your appointment for the MRI has been rescheduled."  Ex. B, p. 2 to Graff Decl. (Docket No. 14, Att. 5).[5]

17.     On March 14, 2012, Mr. Graff had an MRI, which revealed an incidental finding of a central membranous tear of the scapholunate ligament, with a notation that "[t]his finding can be seen in both symptomatic and asymptomatic patients."  *See* Defs.' SOF No. 7 (Docket No. 11, Att. 2); Pl.'s SODF No. 7 (Docket No. 14, Att. 1) Interestingly, Mr. Graff had a *greater* tear in his uninjured left wrist, from which Defendants contend was indicative that Mr. Graff's tear in his right wrist was not clinically significant.  *See id.*

18.     On March 20, 2012, Dr. Agler reviewed the MRI report and determined that Mr. Graff might need an orthopedic consultation if the pain continued and ordered a follow-up examination.  *See id.*

19.     Mr. Graff claims that he was unable to discuss the results of the MRI with Dr. Agler for almost another month.  *See* Pl.'s SOF No. 7 (Docket No. 14, Att. 2).  To this end, in his March 25, 2012 Offender Concern Form directed to ICC medical, Mr. Graff stated:

> I went for an MRI on 3-14-12 in regards to my injured right wrist.  I am wondering what the results of the MRI are.

Ex. A, p. 3 to Graff Decl. (Docket No. 14, Att. 5).  On March 28, 2012, the ICC staff member responded, stating that Mr. Graff was scheduled to see a doctor on April 10, 2012.  *See id.*

---

[5]  It is not clear whether the earlier-referenced February 15, 2012 MRI date and the subsequently-referenced February 22, 2012 MRI date are one and the same.

**MEMORANDUM DECISION AND ORDER - 5**

**E.    April 2012 - June 2012**

20.    According to Mr. Graff, the April 10, 2012 appointment was cancelled for no

apparent reason, prompting him to submit another Offender Concern Form directed to ICC

medical and Dr. Agler on April 9, 2012, which stated:

> I went for an MRI on 3-14-12 in regards to my wrist, then sent a Concern Form on
> 3-25-12 to find out the results of the MRI.  I was told in response on 3-28-12 that I
> am scheduled with the MD on 4-10-12 which is almost a month later and my hand
> has been in pain this whole time.  Now I am not even on the call-out for 4-10-12 to
> see medical.  Why is this injury to my wrist that occurred 7 months ago not being
> addressed in a timely fashion?

Ex. A, p. 4 to Graff Decl. (Docket No. 14, Att. 5).  The next day, Dr. Agler responded, stating:

"It is unclear why you have not yet been seen.  I will put in an order for you to be seen ASAP."

*Id*.

21.    On April 18, 2012, Mr. Graff met with Dr. Agler who, in addition to providing

additional pain medication, ordered an off-site orthopedic consultation with a specialist.  *See*

Defs.' SOF No. 8 (Docket No. 11, Att. 2); Pl.'s SODF No. 8 (Docket No. 14, Att. 1).

22.    On May 18, 2012, Mr. Graff had an offsite consultation with Dr. Kurt J. Nilsson

at St. Luke's Intermountain Orthopedics.  *See id*.  Dr. Nilsson recommended further splinting

and a surgical consultation.  *See id*.

23.    Not immediately receiving Dr. Nilsson's full consultation report following Mr.

Graff's May 18, 2012 visit, Dr. Agler ordered that it be obtained on May 21, 2012.  *See id*.

24.    On June 1, 2012, Mr. Graff filled out an Offender Concern Form, directed to Dr.

Agler, stating:

> I went and saw the orthopedist about my wrist on 5-18-12 and he informed me that
> I would need to meet with the hand surgeon for a consult to discuss the necessary
> surgery to fix my wrist.  I was wondering about what kind of time frame I was

**MEMORANDUM DECISION AND ORDER - 6**

looking at before I saw him.  Since this injury occurred in Oct[ober] and it is now June and the longer it takes the worse the injury seems to get.  This is my dominant hand and I am hoping to get it fixed as soon as possible since it interferes with my daily life.

Ex. A, p. 5 to Graff Decl. (Docket No. 14, Att. 5).  On June 5, 2012, Dr. Agler responded, indicating that "[w]e will move forward with his recommendations as soon as we can."  *Id.*

**F.     July 2012**

25.     On July 9, 2012, Dr. Nilsson prepared and sent Dr. Agler his report concerning Mr. Graff's May 18, 2012 visit.  *See* Defs.' SOF No. 8 (Docket No. 11, Att. 2); Pl.'s SODF No. 8 (Docket No. 14, Att. 1).[6]

26.     Also on July 9, 2012, Mr. Graff filled out an Offender Concern Form, directed to A.W. Kessler, stating:

I have sent multiple Concern Forms to medical in regards to the injury of my right wrist and have gotten no response concerning the time frame as to when it will get fixed.  I saw the specialist, who was not a hand surgeon, on May 18th and he recommended that surgery is necessary to repair the torn ligaments at that time.  This injury occurred in October 2011 while working in maintenance.  It is my dominant hand, and is constantly in pain.  Could you please help expedite the surgery and repair of my wrist (as per our conversation in the chow hall @17:45 on 7-9-12)?

Ex. A, p. 6 to Graff Decl. (Docket No. 14, Att. 5).

27.     On July 10, 2012, Dr. Agler reviewed Dr. Nilsson's report and, based on the recommendations contained therein, ordered an orthopedic consultation with a hand surgeon.

*See* Defs.' SOF No. 9 (Docket No. 11, Att. 2); Pl.'s SODF No. 9 (Docket No. 14, Att. 1).

---

[6] Mr. Graff alleges (and Defendants do not dispute) that it was his mother, Lisa Bennett, who actually called Dr. Nilsson to get his report forwarded to Dr. Agler.  *See* Pl.'s SOF No. 12 (Docket No. 14, Att. 2); *see also* Bennett Decl., ¶¶ 3-4 (Docket No. 14, Att. 3) ("In the summer of 2012, through a conversation with my son, I became aware that the report from Dr. Nilsson had not been given to the prison where Brian was incarcerated.  On or about early July 2012, I called the office of Dr. Nilsson to request that the report be sent over to ICC and Dr. Agler.").

**MEMORANDUM DECISION AND ORDER - 7**

28.     On July 12, 2012, Acel Thacker responded to Mr. Graff's July 9, 2012 Offender

Concern Form, stating:

> We had some difficulties getting a report from the orthopedic surgeon who you saw
> on 5/18.  After many attempts, your mother was able to get them to send us a report
> which referred you to a hand specialist.  Dr. Agler has ordered you to see the hand
> specialist who will determine if surgery is needed.

Ex. A, p. 6 to Graff Decl. (Docket No. 14, Att. 5).

29.     On July 30, 2012, Mr. Graff had an offsite consultation with Dr. Troy B. Watkins

at Mountain States Hand Clinic.  *See* Defs.' SOF No. 9 (Docket No. 11, Att. 2); Pl.'s SODF No.

9 (Docket No. 14, Att. 1)  Dr. Watkins identified that the tear in Mr. Graff's wrist was not

clinically important, that he likely had De Quervain's syndrome, and that he would need to see

the MRI results.  *See id*.  Dr. Watkins placed Mr. Graff in a new splint and recommended a

follow-up visit in three weeks, which Dr. Agler ordered the next day, July 31, 2012.  *See id*.

**G.     August 2012**

30.     On August 1, 2012, Mr. Graff filled out an Offender Concern Form, directed to

Dr. Agler, stating:

> When I saw Dr. Watkins on 7-30-12, he didn't have my MRI results.  If they need
> to be faxed over to him, could you make sure that this is done so that when I see him
> again he will be able to give me the best diagnosis for my wrist?  This way I can get
> it taken care of as soon as possible.

Ex. A, p. 7 to Graff Decl. (Docket No. 14, Att. 5).  On August 7, 2012, Dr. Agler responded,

stating: "I will ensure that the MRI results are faxed ASAP."  *Id*.

31.     On August 7, 2012, Dr. Agler ordered the results of Mr. Graff's March 14, 2012

MRI to be faxed over to Dr. Watkins.  *See* Defs.' SOF No. 10 (Docket No. 11, Att. 2); Pl.'s

SODF No. 10 (Docket No. 14, Att. 1).

**MEMORANDUM DECISION AND ORDER - 8**

32.     On August 13, 2012, Mr. Graff was seen by ICC medical staff, evaluated, and provided additional pain medication.  *See id*.

33.     On August 22, 2012, Mr. Graff had his three-week follow-up appointment with Dr. Watkins, who noted that Mr. Graff had not responded to conservative therapy and would probably need surgery.  *See id*.  Dr. Agler received Dr. Watkins's recommendation and ordered surgery the same day, scheduled for September 18, 2012.  *See id*.

**H.     September 2012**

34.     On September 18, 2012, Mr. Graff had surgery, with Dr. Watkins performing a De Quervain's Release – a procedure that involves making an incision to open the sheath surrounding the tendon to release pressure.  *See id*. at Defs.' SOF No. 11; Pl.'s SODF No. 11. After surgery, Mr. Graff returned to ICC, declined narcotics for pain, but was provided ibuprofen as needed.  *See id*.

**I.     October 2012 - Present**

35.     On October 25, 2012, Mr. Graff had a follow-up visit with Dr. Watkins, who noted that he was doing well and would only need additional follow-up on an as-needed basis. *See id*. at Defs.' SOF No. 12; Pl.'s SODF No. 12.

36.     On November 21, 2012, Mr. Graff was released from ICC.

37.     On May 28, 2013, Mr. Graff filed a Complaint in state court, alleging claims for gross negligence and recklessness against Defendants, stemming from the medical care he received for his injured wrist while at ICC.  *See* Compl. (Docket No. 1, Att. 1).  On May 30, 2014, Mr. Graff amended his claims, alleging Eighth Amendment violations under 42 U.S.C. § 1983.  *See* Am. Compl. (Docket No. 1, Att. 28).  Given these new claims, on June 23, 2014, Defendants removed the action to this Court.  *See* Not. of Removal. (Docket No. 1).

**MEMORANDUM DECISION AND ORDER - 9**

38.     Defendants now move for summary judgment, arguing that there is no actionable

Eighth Amendment violation:

> However, as shown below and in the accompanying materials, the undisputed
> evidence in this case demonstrates that Graff received regular and attentive medical
> care for his injured wrist during the entire period of treatment. He was first provided
> conservative therapy and when his wrist repeatedly failed to heal with such
> intervention, surgery became necessary. Graff's complaints reflect nothing but his
> legally irrelevant difference of opinion with his health care providers and his
> incorrect personal belief that he was constitutionally entitled to the best available
> care. Yet, there is no evidence that would establish Dr. Agler was even negligent,
> let alone that he was deliberately indifferent. Likewise, there is no evidence showing
> that the prison's offsite scheduling practices were deliberately indifferent or
> contributed to any constitutional deprivation. Graff's claims must therefore be
> dismissed with prejudice.

Mem. in Supp. of MSJ, p. 2 (Docket No. 11, Att. 1).

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary

judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323-34 (1986). It is "not a disfavored procedural shortcut," but is instead

the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and

prevented from going to trial with the attendant unwarranted consumption of public and private

resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute

as to any *material* fact – a fact "that may affect the outcome of the case." *Id*. at 248.

MEMORANDUM DECISION AND ORDER - 10

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *See Devereaux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

## B.   42 U.S.C. § 1983, the Eighth Amendment, and Deliberate Indifference

Section 1983 provides a remedy for persons injured as a result of constitutional violations by persons acting under the color of state law, providing in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the

**MEMORANDUM DECISION AND ORDER - 11**

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation and internal marks omitted). To prevail on a § 1983 claim, a plaintiff must show a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under 42 U.S.C. § 1983. *See Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). To prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to his "serious medical needs." *Id.* This includes "both an objective standard – that the deprivation was serious enough to constitute cruel and unusual punishment – and a subjective standard – deliberate indifference." *Id.*

Regarding the objective element of the standard, the Supreme Court has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The Ninth Circuit has defined "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or

**MEMORANDUM DECISION AND ORDER - 12**

treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted).

As to the standard's subjective element, a prison official or prison medical provider acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

In the medical context, a conclusion that a defendant acted with deliberate indifference requires that the plaintiff show both "a purposeful act or failure to respond to a prisoner's pain or possible medical need and . . . harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Indifference "may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *McGuckin*, 974 F.2d at 1059. But, a delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *See McGuckin*, 974 F.2d at 1060. If medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," summary judgment is appropriate. *Toguchi*, 391 F.3d at 1061. Moreover, a mere "difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of

**MEMORANDUM DECISION AND ORDER - 13**

treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Id.*

To be clear, "'the indifference to a [prisoner's] medical needs must be substantial'"; "'[m]ere indifference, medical malpractice, or negligence will not support [a cause of action under the Eighth Amendment.]'" *Plant v. CMS*, 2013 WL 5274226 (D. Idaho 2013) (quoting *Lemire v. California Dept. of Corrs. and Rehabilitation*, 2013 WL 4007558, *15 (9th Cir. 2013)); *see also Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (stating that even gross negligence is insufficient to establish a constitutional violation). "A defendant must purposely ignore or fail to respond to a prisoner's pain or medical need in order for deliberate indifference to be established." *Plaint*, 2013 WL 5274226.

Where an inmate claims that a private prison has violated his constitutional rights, the plaintiff must point to evidence showing that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains. *See Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658, 694 (1978); *see also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities performing state functions); *Hayes v. Corrs. Corp. of Am.*, 2012 WL 4481212, *18, n.14 (D. Idaho 2012) (recognizing that CCA is state actor subject to suit under § 1983). To do so, the plaintiff must go beyond the respondeat superior theory of liability and demonstrate that the alleged constitutional deprivation was the product of a policy or custom of the local governmental unit, because municipal liability must rest on the action of the municipality and not the actions of the employees of the municipality. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011).

Thus, under *Monell*, the requisite elements of a § 1983 claim against a private entity are: (1) the plaintiff must show that he was deprived of a constitutional right; (2) that the

**MEMORANDUM DECISION AND ORDER - 14**

municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate

indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force

behind the constitutional violation.  *See Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11

(9th Cir. 2001).  If the policy or custom in question is an unwritten one, the plaintiff must show

that it is so "persistent and widespread" that it constitutes a "permanent and well settled"

practice.  *Monell*, 436 U.S. at 691.  "Liability for improper custom may not be predicated on

isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency

and consistency that the conduct has become a traditional method of carrying out policy."

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).[7]

## III.  DISCUSSION

**A.    Dr. Agler Was Not Deliberately Indifferent to Mr. Graff's Serious Medical Need**

For the purposes of Defendants' Motion for Summary Judgment, the Court is satisfied

that the alleged "continuous severe pain" associated with Mr. Graff's wrist injury constitutes a

"serious medical need."  *See* Am. Compl., ¶ 11 (Docket No. 1, Att. 28); *cf. Roberts v. Blades*,

2015 WL 5611581, *3 (D. Idaho 2015) (equating intense back pain with serious medical need).

Defendants agree.  *See* Mem. in Supp. of MSJ, p. 6 (Docket No. 11, Att. 1) ("For purposes of

this summary judgment only, CCA Defendants will assume that Graff's wrist condition

constitutes a serious medical need.").  Therefore, the relevant focus (as to both Dr. Agler and the

---

[7] "Furthermore, all policy-based claims must meet the pleading standards clarified by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)."  *Hayes*, 2012 WL 4481212 at *8.  That is, mere "formulaic recitation of a cause of action's elements" is insufficient.  *Twombly*, 550 U.S. at 555.  Stated another way, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

**MEMORANDUM DECISION AND ORDER - 15**

CCA) is on the second prong of the test – whether Defendants were deliberately indifferent to Mr. Graff's serious medical need/pain.  *See supra*.

Mr. Graff argues that Dr. Agler was deliberately indifferent to his serious medical need by virtue of several delays during the course of Mr. Graff's medical care and treatment.  *See* Opp. to MSJ, p. 3 (Docket No. 14) ("Summary judgment is not appropriate in this matter because the record shows that Dr. Agler was aware of the need to take immediate action but chose to delay, pass the buck, and obstruct necessary treatment.").  On this point, Mr. Graff's Amended Complaint alleges the following:

¶ 9.    The Plaintiff complained of his injury and, more than 5 months [later], was taken to get an MRI on March 14, 2012.

¶ 10.   The MRI showed that the Plaintiff had a torn ligament/tendon in his right wrist.

¶ 11.   The torn ligament/tendon caused the Plaintiff continuous severe pain.

¶ 12.   The torn ligament/tendon made it difficult and painful for the Plaintiff to perform many ordinary daily activities, including his job at the prison.

¶ 13.   Dr. Agler reviewed the results of the MRI and was aware that the Plaintiffs' ligament/tendon was torn and that the Plaintiff was in severe pain.

¶ 14.   After reviewing the MRI, rather than giving the Plaintiff immediate care for his painful condition, Dr. Agler allowed 6 months of delays to ensue before the Plaintiff was finally given surgery to fix the tear on September 18, 2012.

¶ 15.   Dr. Agler's actions and omissions in allowing such a long delay to occur were grossly negligent and reckless, willful, and wanton.

¶ 16.   In doing this, Dr. Agler's actions and/or omissions fell short of the applicable standard of care.

Am. Compl., ¶¶ 9-16 (Docket No. 1, Att. 28).  From this, it would appear that Mr. Graff's complaints of delays fit within two overarching categories: (1) the delay between his October

**MEMORANDUM DECISION AND ORDER - 16**

2011 injury and the March 14, 2012 MRI; and (2) the delay between Dr. Agler's review of the

MRI results and Mr. Graff's September 18, 2012 surgery.  *See id.*  However, Mr. Graff has since

clarified the scope of Dr. Agler's alleged delays, commenting within his opposition to

Defendants' summary judgment efforts:

> Mr. Graff has alleged a host of significant delays between his injury and his eventual
> surgery.  The four most notable delays occurred when (1) there was a need for an
> MRI evaluation, (2) the report from Dr. Nilsson was not obtained, (3) the MRI
> results were not provided to Dr. Watkins, and (4) when it took almost another month
> to perform surgery.

Opp. to MSJ, p. 4 (Docket No. 14).  The Court considers each of these alleged unconstitutional

delays in turn below, concluding that, on the whole, Dr. Agler was not deliberately indifferent to

Mr. Graff's serious medical need.

First, it is true that Mr. Graff had an MRI five months after his injury.  If, indeed, Mr.

Graff's medical care was only contained in such stark terms, a claim of deliberate indifference

might very well take hold; but what actually happened in between his injury and the MRI paints

a more involved picture.  During the five months in between his October 2011 injury and March

14, 2012 MRI:

- Mr. Graff saw and was treated by a nurse practitioner four times – twice in
  November, once in December, and once in January – who prescribed pain
  medication, immobilized/splinted his wrist, provided care instructions, and
  scheduled appointments.

- Mr. Graff had two x-rays – one in November and one in December.

- Dr. Agler diagnosed Mr. Graff with De Quervain's tenosynovitis syndrome
  in December, ordering corticosteroid treatment and physical therapy.

- Mr. Graff saw a physical therapist twice in January who discussed wrist
  exercises and performed adjustments to his wrist splint.

**MEMORANDUM DECISION AND ORDER - 17**

- Dr. Agler saw Mr. Graff again in January, at which time Dr. Agler ordered an MRI and also determined that Mr. Graff may need to see an orthopedic specialist.

- Mr. Graff's was scheduled for at least one MRI in February, only to have it cancelled and re-schedule for the March 14, 2012 date.[8]

*See supra.*

This factual backdrop does not reflect a situation in which Mr. Graff and his injured wrist were altogether ignored, disregarded, or purposely delayed. *Compare with Wahl v. CCA*, 2015 WL 439720 (D. Idaho 2015) (finding purposeful delay when doctor saw plaintiff on September 2, 2011, but did not order visit to outside orthopedist until January 26, 2012 (despite being aware of plaintiff's pain and report of degenerative disease in affected finger), and did not actually see outside orthopedist until April 16, 2012). This is particularly the case when understanding that treating De Quervain's tenosynovitis syndrome begins conservatively, using immobilizing splints, non-steroidal anti-inflammatory drugs, and steroids, before surgery is considered. *See* Keller Rpt., attached as Ex. A to Keller Decl. (Docket No. 11, Att. 7) ("Most cases of De Quervain's syndrome respond to these therapies. Surgery is rarely needed, and is only done after patients have repetitively failed more conservative options. . . . . Dr. Agler and the medical staff at ICC appropriately treated Mr. Graff's De Quervain's syndrome and appropriately made specialist referrals."). That certain events could have taken place on a more expedited basis to ensure an earlier MRI is beyond refute and Mr. Graff's frustration in that respect is

---

[8] According to Defendants, Dr. Agler had no role in actually scheduling offsite appointments; instead, they are coordinated by Inmate Health Services, a third-party health care organization. *See* Defs.' Reply in Supp. of MSJ, p. 4 (Docket No. 16) (citing Defs.' SOF Nos. 14-16 (Docket No. 11, Att. 2)).

**MEMORANDUM DECISION AND ORDER - 18**

understandable.[9]  However, at most, such conduct (even if entirely capable of attribution to Dr.

Agler) amounts only to potential negligence which, without more, cannot support a finding of

deliberate indifference here.

Second, any delay in securing Dr. Nilsson's full consultation report following Mr.

Graff's May 18, 2012 visit (at which time Dr. Nilsson recommended further splinting and a

surgical consultation), ignores the fact that Dr. Agler requested Dr. Nilsson's report on May 21,

2012.  *See supra*.  Except the report wasn't ready.  When Mr. Graff asked about the status of

things on June 1, 2012, Dr. Agler responded four days later that "[w]e will move forward with

[Dr. Nilsson's] recommendations as soon as we can," recognizing that Dr. Nilsson's report was

still unavailable.  *See supra*.  That it was Mr. Graff's mother who may have once-and-for-all

prompted Dr. Nilsson to complete his report and forward it onto Dr. Agler on July 9, 2012 does

not evidence that Dr. Agler was "sitting on his hands" as Mr. Graff now argues.  *See* Opp. to

MSJ, p. 5 (Docket No. 14).[10]  In short, *Dr. Nilsson's* delay in this respect should not be

completely borne by Dr. Agler so as to inform the question of whether the latter was deliberately

indifferent to Mr. Graff's serious medical need.

---

[9]  Mr. Graff adds that, even after Dr. Agler reviewed the MRI results on March 20, 2012,
Dr. Agler refused to see him until April 18, 2012, and, even then, had to wait until May 18, 2012
to see a specialist.  *See* Opp. to MSJ, p. 5 (Docket No. 14).  Again, these complaints, while
relatable, do not amount to deliberate indifference when keeping in mind that Dr. Agler (1)
ordered a follow-up appointment with Mr. Graff for April 10, 2012 and, (2) when that did not
happen, ordered that the appointment take place "ASAP" that same day, (3) ultimately meeting
Mr. Graff on April 18, 2012, prescribing Mr. Graff more pain medication, and (4) ordering the
off-site orthopedic consultation with a specialist (that eventually took place on May 18, 2012).
*See supra*.

[10]  Particularly when, in response to Mr. Graff's July 9, 2012 Offender Concern Form,
Acel Thacker indicated that ICC medical made "many attempts" to secure Dr. Nilsson's report.
*See supra*.

**MEMORANDUM DECISION AND ORDER - 19**

Third, although Dr. Watkins did not have Mr. Graff's MRI results during the July 30, 2012 consultation, there is no indication in the record that it was Dr. Agler's responsibility to secure and forward them to Dr. Watkins ahead of time.  Still, once Mr. Graff raised the issue in an August 1, 2012 Offender Concern Form, Dr. Agler responded on August 7, 2012 the "he will ensure that the MRI results are faxed ASAP" and ordered that they be so faxed to Dr. Watkins that same day.  *See supra*.  But more to the point, nothing in the record suggests that the lack of any MRI report as of the July 30, 2012 consultation impacted Dr. Watkins's treatment of Mr. Graff in any respect.  That is, Dr. Watkins scheduled a follow-up appointment with Mr. Graff three weeks thereafter to assess the benefit, if any, his treatment had on Mr. Graff's condition (reviewing in the meantime the MRI results).  *See* 7/30/12 Note, attached as Ex. A to Williams Decl. (Docket No. 11, Att. 9) ("I have discussed with him the differential diagnosis for this.  I have injected the 1st extensor compartment with the Celestone and Xylocaine, placed him into a hand-based thumb spica splint, and I will see him back in three weeks.").  This is confirmed when, during Mr. Graff's follow-up consultation with Dr. Watkins on August 22, 2012, Dr. Watkins commented (without any mention of the MRI results):

> Mr. Graff returns today for follow-up for De Quervain's syndrome from which he has not responded to conservative management.  In fact, he has as much pain today as he did when I first saw him three weeks ago and injected the 1st extensor compartment.  He has markedly positive Finkelstein's maneuver.  I think he probably is not going to improve without release of the 1st extensor compartment.  I have explained in detail to him what is involved.  I have answered his questions.  We talked about potential complications, particularly pertaining to the ulnar nerve.

*See* 8/22/12 Note, attached as Ex. A to Williams Decl. (Docket No. 11, Att. 9).  Accordingly, any delay in providing Dr. Watkins with Mr. Graff's MRI results ahead of the July 30, 2012 consultation is not instructive toward resolving whether Dr. Agler acted deliberately indifferent when treating Mr. Graff's injury.

**MEMORANDUM DECISION AND ORDER - 20**

Finally, there is no basis to suggest that scheduling Mr. Graff's September 18, 2012 surgery within a month of Dr. Watkins's second consultation with Mr. Graff (and at which time Dr. Watkins indicated that Mr. Graff will need a surgical release) represents a delay amounting to Dr. Agler's deliberate indifference – even if assuming Dr. Agler is the person responsible for scheduling such offsite appointments.[11]

With all this in mind, the above-discussed incidents do not represent deliberate indifference by Dr. Agler to Mr. Graff's serious medical need.  This is not to say that Mr. Graff's dissatisfaction with the time it took to treat and resolve his injured wrist while at ICC is unwarranted – of particular concern to the Court is the amount of time (from beginning to end) for this to take place, regardless of the appropriateness of conservative treatment generally and such conservative treatment's progress (or lack of progress) during the interim.  Still, the at-issue delays are either benign (at least from a legal standpoint) or capable of completely innocuous explanations such that any collective persuasive value associated with these delays in their entirety is broken apart and compromised, particularly when examined against a deliberate

---

[11]  Mr. Graff characterizes the one-month period in between his second visit with Dr. Watkins and his surgery as "particularly amazing given that Dr. Agler has ability to speed up the timelines for surgery . . . and Dr. Watkins can be ready for surgery within a week."  Opp. to MSJ, p. 6 (Docket No. 14).  These statements are problematic, however, because the citations to the record evidencing such statements are not as clear-cut as Mr. Graff suggests.  For example, not only is there no Exhibit H, but the referenced deposition testimony from Dr. Agler (in another case and at Exhibit A – sounds somewhat like H – to Aaron Tribble's Declaration) speaks only to Dr. Agler's chain of command.  *See* Agler Dep. at 24:11-25:11, attached as Ex. A to Tribble Decl., ¶ 2 (Docket No. 15, Att. 1).  And, again, not only is there no Exhibit M, but the referenced deposition testimony of Dr. Watkins (also in another case and at Exhibit D) indicates that he would have typically performed surgery (on a different patient) "within the next several weeks" or "within 2 or 3 [weeks]."  *See* Watkins Dep. at 45:12-46:3, attached as Ex. D to Tribble Decl., ¶ 5 (Docket No. 15, Att. 4).  Regardless, even if such representations are true (and/or the Court made a mistake in its own review of the record), they do not support a conclusion that scheduling surgery a month after the consultation recommending the same is a delay sounding in deliberate indifference.

**MEMORANDUM DECISION AND ORDER - 21**

indifference template.  *See, e.g.*, Keller Rpt., attached as Ex. A to Keller Decl. (Docket No. 11,

Att. 7) ("Mr. Graff received all of these appropriate therapies both from the medical staff at ICC

and from Dr. Watkins. . . . .  In my professional opinion, to a reasonable degree of medical

certainty, Dr. Agler's medical treatment of Mr. Graff satisfied the standard of care.").  As a

result, on this record, it would be unreasonable to draw nefarious inferences against Dr. Agler

and conclude that he "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety."

*Toguchi*, 391 F.3d at 1057.  Arguments that Dr. Agler could have done more to expedite his

treatment of Mr. Graff's injury miss the point when "a complaint that a physician has been

negligent in diagnosing or treating a medical condition does not state a valid claim of medical

mistreatment under the Eighth Amendment."  *Estelle*, 429 U.S. at 106.  Summary judgment is

therefore proper as to Dr. Agler.

**B.    Mr. Graff Cannot Show That His Alleged Delays in Treatment Were Attributable to CCA Policy**

In support of his *Monell* claim against CCA, Mr. Graff states matter-of-factly that "there

is ample evidence showing that the unofficial custom of delaying treatment, in this case,

amounted to deliberate indifference causing [him] almost a year of pain and suffering."  Opp. to

MSJ, p. 8 (Docket No. 14).  But, aside from Mr. Graff's allegations themselves, his only

"evidence" of CCA's "unofficial custom of delaying treatment" is two *other* cases in which

similar allegations were made – *Caplinger v. CCA* and *Wahl v. CCA*.[12]  Even when assuming the

existence of an underlying constitutional violation, this is not enough to establish the requisite

policy to support a *Monell* claim against CCA.

_____

[12]  Mr. Graff's counsel in this case, Aaron Tribble, also represented the plaintiffs in
*Caplinger* and *Wahl*.

**MEMORANDUM DECISION AND ORDER - 22**

First, as discussed above, the record reveals that there were was no deliberate indifference with respect to Mr. Graff's serious medical need (at least as to Dr. Agler).  *See supra*.  To this end (and independent of any actual medical treatment itself), the Court finds that, when prison medical personnel ordered the six offsite consultations, the appointments were made in sufficiently timely and acceptable fashion.  That such appointments may not have been actually scheduled until much later is not evidence of a underlying CCA policy to delay medical treatment – especially when considering that it is Inmate Health Services who coordinates the scheduling of offsite appointments.  *See supra*; *see also* Defs.' SOF No. 17 (Docket No. 11, Att. 2) ("All of those visits were submitted for approval, approved, and scheduled within mere days of being recommended and ordered.  More so, <u>all</u> appointments were scheduled in cooperation with the offsite provider and were all scheduled for appointments for within one month of the scheduling date. ") (emphasis in original); Pl.'s SODF No. 17 (Docket No. 14, Att. 1);[13] *Caplinger v. CCA*, 999 F. Supp. 2d 1203, 1217-18 (D. Idaho 2014) ("Doctors' offices often do not have open appointments for several weeks out.  Similarly, that some of Plaintiff's appointments had to be cancelled does not mean that they were cancelled as a result of a custom or policy on the part of CCA.").

Second, in both *Caplinger* and *Wahl*, this Court granted the defendants' motions for summary judgment on the plaintiffs' *Monell* claims.  For example, in *Caplinger*, U.S. District Judge B. Lynn Winmill found:

> Even in hindsight, it is clear that Plaintiff should have been sent to an orthopedic surgeon sooner, and even if his surgery should have been performed sooner once it

---

[13]  Mr. Graff does not dispute these facts, except to again challenge the reason provided for why the February 15, 2012 MRI was cancelled.  *See* Pl.'s SODF No. 17 (Docket No. 14, Att. 1) ("The Plaintiff does not dispute Defendants' Fact #17 except that this fact uses the same unsupportable hearsay statement about the reasons for the MRI being cancelled on Feb 15.").

**MEMORANDUM DECISION AND ORDER - 23**

was ordered, Plaintiff has not come forward with sufficient evidence that CCA's customs constitute deliberate indifference or that they caused a deprivation of Plaintiff's constitutional rights. Although it appears to the Court that the system CCA has put in place to treat inmates' serious medical needs is not an ideal way to deliver health care in a perfect world, this is not a negligence or medical malpractice case. Note every mistake in correctional medical care constitutes an Eighth Amendment violation. Plaintiff has simply not overcome Defendants' evidence that Plaintiff's medical treatment satisfied constitutional standards.

*Caplinger*, 999 F. Supp. 2d at 1218, *aff'd*, 2016 WL 454327 (9ᵗʰ Cir. 2016). Likewise, in *Wahl*,

U.S. District Judge William B. Shubb stated:

> Plaintiff's only evidence of a custom or practice are depositions and interrogatories produced during discovery in *Caplinger*, another case involving an inmate at ICC who also experienced delays in medical treatment. Caplinger alleged that there were consistent delays in his visits to Dr. Watkins despite his constant severe pain, broken bone, and torn ligaments, but he ultimately lost on motion for summary judgment. Even if there were also delays in *Caplinger*, taken together, two instances of delay is insufficient to establish a custom "with the force of law." *See Gillette* [v. Delmore], 979 F.2d [1342,] 1348-49 [(9ᵗʰ Cir. 1992)]; *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7ᵗʰ Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident – or even three incidents – do not suffice."). Plaintiff points to no other evidence indicating that CCA had a widespread, settled custom of purposely delaying expensive offsite visits that was the "moving force" behind an Eighth Amendment violation. Plaintiff has failed to present any evidence that CCA officials were aware that an informal custom of delays existed. Plaintiff thus offers insufficient evidence of a policy or custom in connection with his alleged constitutional deprivations, so his *Monell* claim must fail. Accordingly, the court will grant defendants' motion with respect to the *Monell* claim against CCA.

*Wahl v. CCA*, 2015 WL 439720, *8 (D. Idaho 2015) (internal citations omitted). Given the

disposition of these two cases, it is difficult to see how they support Mr. Graff's claim of an

unofficial policy/custom of delay as to CCA.

Third, even if the *Monell* claims in *Caplinger* and *Wahl* were not dismissed on summary

judgment, their application here is somewhat of an "apples and oranges" comparison. Given the

fact-intensive nature of *Monell* claims, what may have happened (or was alleged to have

happened) in either *Caplinger* and *Wahl* does not mean *ipso facto* that the same scheduling

**MEMORANDUM DECISION AND ORDER - 24**

problems and delays (or reasons contributing to such problems and delays) happened here.  *See Caplinger*, 999 F. Supp. 2d at 1218 ("Dr. Watkins's statement about the general rule of his practice says nothing about what happened in this particular case when CCA employees scheduled Plaintiff's offsite appointments.").  While other cases involving the same parties with similar allegations unquestionably has this Court's attention in a general sense (and no doubt serves as a sort of reality check for Defendants moving forward), they are not, by themselves, dispositive of the issue.

What remains, then, is an absence of proof of any policy serving as the motivating factor for delaying medical treatment at ICC.   Without the necessary policy, there is no *Monell* claim against CCA.  Again, summary judgment is therefore proper as to CCA.

## IV.  <u>ORDER</u>

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Docket No. 11) is GRANTED.

DATED:  **March 23, 2016**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 25**